IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  18-cv-01317-KLM

FAUSTINO IBARRA,

　　　　Plaintiff,

v.

ANDREW M. SAUL, Commissioner of Social Security[1]
_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

　　　　This matter is before the Court[2] on review of the Commissioner's decision denying

Plaintiff's claim for Supplemental Security Income Benefit ("SSI") under the Social Security

Act (the "Act"), 42 U.S.C. § 401, *et seq.*   The Court has jurisdiction to review the

Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).   The Court has

reviewed the Opening Brief [#14][3], the Response Brief [#15], the Administrative Record

[#11] ("Tr."), and the applicable law and is sufficiently advised in the premises.   For the

reasons set forth below, the decision of the Commissioner is **REVERSED** and **REMANDED**

---

[1] On June 17, 2019, Andrew M. Saul was sworn in as the Commissioner of the Social Security Administration.  Pursuant to Fed. R. Civ. P. 25(d), Andrew M. Saul is substituted as the Defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The parties consented to proceed before the undersigned for all proceedings pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2.  *See* [#17].

[3] Exhibit [#14] is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF).  This convention is used throughout this Order.

-1-

for further fact finding.

## I. Background

Plaintiff was born on August 11, 1978.  Tr. 26.  He filed an application for SSI in January 2015 in which he alleged disability due to mental impairments.  *Id.* 26, 170-78. Following the initial administrative denial of his claim, Plaintiff timely requested a hearing by an Administrative Law Judge ("ALJ").  *Id.* 109.  A hearing was held on March 23, 2017. *Id.* 33-87.  On May 22, 2017, the ALJ denied Plaintiff's claim.  *Id.*

In the ALJ's decision, the ALJ identified and applied the five-step sequential evaluation required by law.  Tr. 13-27.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since January 22, 2015, the application date. *Id.* 14.  At steps two and three, the ALJ found that Plaintiff had severe impairments including "bipolar I disorder; affective disorder; and an anxiety disorder," but that he did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments.  *Id.* 15-17.  The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with only occasional interaction with supervisors, coworkers, and the public.  *Id.* 17.  With the assistance of a vocational expert, the ALJ found at step four that Plaintiff could perform his past work as a protective signal installer helper.  *Id.* 26.  Alternatively, at step five, the ALJ found that Plaintiff could perform other work existing in significant numbers in the national economy.  *Id.* 26-27.  Therefore, the ALJ concluded that Plaintiff was not disabled.  *Id.* 28.

The Appeals Council denied review of Plaintiff's claim on April 3, 2018.  Tr. 1-6. Thus, the ALJ's decision became final for purposes of judicial review.

## II.  Standard of Review and Applicable Law

Pursuant to the Act:

[T]he Social Security Administration (SSA) is authorized to pay disability insurance benefits and Supplemental Security Income to persons who have a "disability." A person qualifies as disabled, and thereby eligible for such benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

*Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003) (quoting 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B)).  Under the applicable legal standard, a claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); *see also Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009).  The existence of a qualifying disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.  42 U.S.C. §§ 423(d)(3), 423(d)(5)(A).

"When a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined effects of the impairments in making a disability determination."  *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)).  However, the mere existence of a severe impairment or combination of impairments does not require a finding that an individual is disabled within the meaning of the Act.  To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months.  *See Kelley v. Chater,* 62 F.3d 335, 338 (10th Cir. 1995).

The Court reviews the ALJ's decision by examining the administrative record and determining "whether the [ALJ's] factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"Evidence is not substantial if it is overwhelmed by other evidence or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). In other words, the Court's determination of whether the ALJ has supported his or her ruling with substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). In addition, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

A court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262. However, it "may not reweigh the evidence nor substitute [its] judgment" for the Commissioner's. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F. 3d 739, 741 (10th Cir. 1993). Thus, even when some evidence could support contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court may have "made a different choice. . . ." *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

## III. Analysis

### A. The Weighing of the Medical Evidence and Impact on the RFC

Plaintiff first asserts that the RFC is not supported by substantial evidence because the ALJ failed to evaluate the medical evidence and medical source opinions as required by 20 C.F.R. § 416.927.[4]  *Opening Br.* [#14], at 6-14.  Thus, Plaintiff avers that the ALJ erred in giving little weight to treating psychiatrist Dr. Menninger's opinions, and in giving great weight to the opinion of nonexamining state agency psychologist Dr. Suyeishi and to a portion of the opinion of consultative examiner Dr. Malmstrom.  The Court turns to those opinions.

### 1. The Opinions of the Medical Providers and the Weight Given Them

Dr. Menninger filled out a Mental Health Questionnaire diagnosing Plaintiff with bipolar disorder in August 2015.  Tr. 419-22.  According to Dr. Menninger,  Plaintiff had a medically documented history of an affective disorder "of at least 2 years duration that has caused more than a minimal limitation of ability to do any basic work activity," along with a "residual disease process that has resulted in such a marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."  *Id.* 422.  Dr. Menninger opined that Plaintiff had moderate difficulties in maintaining social functioning[5] and in concentration, persistence or

---

[4] The rules in 20 C.F.R. § 416.927 apply to Plaintiff's claim because it was filed before March 27, 2017.

[5] "Social functioning refers to [a claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals, ... [and] in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers."  20 C.F.R. Part 404, Subpart P, Appendix 1, §12.00.C.

pace.  *Id*. 421.  He also opined that Plaintiff would miss more than four days of work per month and would be "off task" for more than 50% of the workday.  *Id*. 422.  Plaintiff's prognosis was "fair" according to Dr. Menninger.  *Id*. 419.

Dr. Menninger made similar findings in his Mental Health Questionnaires completed in October 2016 (Tr. 414-18) and March 2017 (*id*. 642-49); however, Plaintiff's mental limitations were documented as more severe.  Thus, in October 2016, Dr. Menninger opined that while Plaintiff still had moderate deficiencies of concentration, persistence or pace, Plaintiff's social functioning limitations increased to marked or extreme.  *Id*. 417.  Plaintiff also had one or more repeated episodes of decompensation within a 12 month period.  *Id*.  Plaintiff's prognosis at that time was "guarded," although Dr. Menninger noted that Plaintiff may have modest improvement over the long term.  *Id*. 415.

In March 2017, Dr. Menninger opined that Plaintiff had moderate limitations in deficiencies of concentration, persistence or pace, extreme difficulties in social functioning, and one or two repeated episodes of decompensation.  Tr. 645.  Dr. Menninger noted that the low number of repeated episodes of decompensation was "related to strong support from father."  *Id*.  As to work-related activities, Dr. Menninger found that Plaintiff had marked limitations in the ability to carry out complex instructions and the ability to make judgments on complex work-related decisions; and extreme limitations in the ability to interact with the public, supervisors, and co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting.  *Id*. 647-48.  Plaintiff's prognosis at that time was "guarded due to lack of improvement in insight."  *Id*. 643.

Consultative examiner Dr. Malmstrom opined in May 2015 that Plaintiff was "capable of following complex instructions and could cooperate with supervisors but is only

marginally capable of cooperating with coworkers, as he agrees he finds them offensive." Tr. 412-13. Dr. Malmstrom diagnosed Plaintiff with "Major depressive order NOS" and Anxiety order NOS[.]" *Id.* 412.

Also in May 2015, nonexamining state agency psychologist Dr. Suyeishi opined that Plaintiff had moderate limitations in many areas of social interaction. Tr. 94. According to Dr. Suyeishi, Plaintiff could make complex decisions, work with abstract ideas, and make independent judgments, but could not work closely with supervisors or coworkers. *Id.* 95. Dr. Suyeishi opined, however, that Plaintiff could accept supervision and relate to coworkers if the contact was not frequent or prolonged. *Id.*

The ALJ chose to give "great weight" to the least restrictive opinion, that of nonexamining psychologist Dr. Suyeishi, as well as the opinion of consultative examiner Dr. Malmstrom with one notable exception discussed below. Tr. 25, 23. While the ALJ acknowledged that psychiatrist Dr. Menninger was a treating source, the ALJ gave "lesser weight" to Dr. Menninger's opinions finding that they were "neither controlling nor persuasive." *Id.* 24-25. The Court finds errors with the weighing of the medical opinions.

## 2. Errors as to the Weighing of Dr. Menninger's Opinions

As Dr. Menninger was a treating doctor, the ALJ was required to conduct a "sequential two-step inquiry" as to his opinions, "each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). "The initial determination the ALJ must make with respect to a treating physician's opinion is whether it is conclusive, i.e., is to be accorded 'controlling weight,' on the matter to which it relates." *Id.* (citation omitted). The opinion "must be given controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial

evidence in the record." *Id.* "If the opinion is deficient in either of these respects, it is not to be given controlling weight." *Id.* That does not, however, end the inquiry. "Even if a treating opinion is not given controlling weight, it is still entitled to deference; at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the regulations for this particular purpose, for the weight assigned."[6] *Id.* If this is not done, a remand is required. *Id.*

Here, the ALJ found that Dr. Menninger's opinions were not entitled to controlling weight, stating that an ALJ can "discount or totally reject a treating source's opinion, if that opinion is not supported by medically acceptable findings and is inconsistent with the other evidence of record." Tr. 25. The ALJ further stated that "[t]he medical evidence from Dr. Menninger, and MHCD (Mental Health Center of Denver) . . . fails to show any symptoms that rise to the level to preclude all work activity," and Dr. Menninger's opinions were thus "not entirely persuasive" and not controlling. *Id.* While this finding is relevant to the first step of the two-step inquiry, there is no indication that the ALJ proceeded to the second step and considered the relevant factors and determined whether Dr. Menninger's opinion should be given deference. This was error. *See Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (if the conditions for giving an opinion controlling weight are

---

[6] The regulatory factors are: "'(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (citations omitted).

lacking, an ALJ is not free to simply disregard the opinion or pick and choose which portions to adopt; instead, the ALJ must proceed to the second step); *Oldham*, 509 F.3d at 1258 (the ALJ's decision must reflect that the ALJ considered the relevant factors in the weight calculation).

For example, the ALJ failed to consider the length of time that Dr. Menninger had treated Plaintiff and the fact that Dr. Menninger was a specialist. The ALJ also failed to consider the degree to which Dr. Menninger's findings were supported by other medical evidence, including Dr. Malmstrom's consultative opinion. Dr. Malmstrom observed that Plaintiff "appeared to be in constant motion, gesturing, tapping his feet, and giving nonstop explanations," that Plaintiff's "behavior was overactive, anxious, hyperactive," his "affect and facial expression was mainly flat," Plaintiff had rapid and pressured speech, his thought processes were at time confused, and Plaintiff "gave the appearance of being one who is in constant anxiety and impatience." Tr. 411. These were many of the same symptoms noted by Dr. Menninger. Dr. Malmstrom also found that Plaintiff had elevated symptoms of depression and high levels of anxiety. *Id.* 412.[7]

A Med-9 Form completed by Dr. Czaban in 2015 also supported Dr. Menninger's findings, as Dr. Czaban found that Plaintiff was totally and permanently unable to work for 12 months or more as a result of mental disorders. Tr. 321-22. Further, an assessment of Plaintiff by Dr. Czaban (*id.* 382-84) describing abnormal and psychotic thought

---

[7] These opinions were rendered despite the fact that Dr. Malmstrom did not appear to have the benefit of Dr. Menninger's 2015 opinion or the treatment records. *See id.* ("Review of Records"). While the ALJ noted that Dr. Malmstrom found Plaintiff's claims of psychosis to be dubious (*id.* 20), it is questionable whether Dr. Malmstrom would have made this same finding if he had Dr. Menninger's treatment records, which are described in more detail below.

processes as discussed in more detail below, also supported the opinion of Dr. Menninger. Further support was provided by the GAF (Global Assessment of Functioning) scores in the record which consistently ranged below 50.[8] Regardless of the weight that the ALJ chose to give to this evidence, the ALJ was required to consider it in assessing the extent to which the record supported the treating psychiatrist's opinions.

The ALJ also erred by relying on improper grounds and making improper lay judgments in giving little weight to Dr. Menninger's opinions. Thus, the ALJ found that "in expressing his disability opinions" Dr. Menninger "appears to be actively assisting and advocating the claimant's attempt to get benefits, rather than simply treating the claimant or offering objective opinions that are corroborated by treatment records." Tr. 25. "As such, his opinions appear to lack neutrality and reliability." *Id.* However, "[t]he fact that an opinion has been solicited to aid a claimant in supporting [his] claim for benefits provides no basis for discrediting an otherwise well-supported source opinion. . . ." *Gonzales v Colvin*, 69 F. Supp. 3d 1163, 1170-71 n.4 (D. Colo. 2014), *see also McGoffin v. Barnhart*, 288 F.3d 1248, 1253 (10th Cir. 2002) (the fact that a treating physician "advocates his patient's cause is not a good reason to reject his opinion").

Similarly, the ALJ noted on two separate occasions in the decision that Dr. Menninger's August 2015 assessment was completed the same day that Plaintiff's

_____

[8] *See id.* 281, 293, 342, 345, 347, 373, 378, 634, 640. A GAF score between 41 and 50 is indicative of "'[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n. 1 (10th Cir. 2012) (citation omitted). Standing alone, a low GAF score does not necessarily indicate an impairment seriously interfering with a claimant's ability to work." *Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004). "A GAF score of fifty or less, however, does suggest an inability to keep a job." *Id.*; *see also Petree v. Astrue*, 260 F. App'x 33, 42 (10th Cir. 2007) ("a low GAF score does not alone determine disability, but is instead a piece of evidence to be considered with the rest of the record").

attorney was present at a treatment visit. Tr. 22, 25. The ALJ found this "suggests that this treating source may be persuaded to posit opinions that are based on subjective complaints rather than significant objective findings." *Id.* 22. This is improper speculation and does not provide a basis to discount a treating doctor's medical findings. *See Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004) ("'In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences . . . and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation, or lay opinion.*'").

Further, to the extent Dr. Menninger may have considered Plaintiff's subjective complaints in his opinions, this was not improper. The Tenth Circuit has made clear that "[t]he practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements." *Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005). Thus, a psychological opinion need not be based on solely objective tests; the findings "'may rest either on observed signs and symptoms or on psychological tests.'" *Id.* (quoting *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004)). When an ALJ rejects a doctor's opinion because he bases it, in part, on the claimant's subjective responses, this "impermissibly put[s] the ALJ in the position of judging a medical professional on the assessment of medical data." *Id.* at 759-60.

The Court also finds error in the ALJ's finding that the "medical evidence from Dr. Menninger and MHCD . . . fails to show any symptoms that rise to the level to preclude all work activity." Tr. 25. Dr. Menninger made specific medical findings that supported his opinion that Plaintiff had marked/extreme difficulties in social functioning and would have difficulty working on a sustained basis. These included such findings as marked mood

swings with episodes of severe mania, grandiosity, irritability, delusional thinking, impairment in impulse control, mood disturbance, inflated self-esteem, illogical and paranoid thinking, perceptual or thinking disturbances, hallucinations or delusions, manic syndrome, delusions of grandeur, and poor insight into his mental illness. *See id.* 415-25. A physician's statements about a claimant's condition or impairments "are specific medical findings" that the ALJ errs in rejecting in the absence of conflicting evidence. *Washington*, 37 F.3d at 1439.

Moreover, contrary to the ALJ's finding, treatment records by Dr. Menninger and other providers at MHCD supported Dr. Menninger's opinions. For example, a November 2016 assessment by Dr. Menninger diagnosed Plaintiff with "Bipolar I disorder current or most recent episode manic with psychotic features" and stated that Plaintiff had a "history consistent with mania, psychosis and significant legal consequences[,]" that Plaintiff had "very limited insight into his illness[,]" and that he had difficulty remaining employed and infrequent work. Tr. 469, 471-72. In February 2015, Dr. Czaban found that Plaintiff's judgment and insight were abnormal and poor, and that his thought process was abnormal/psychotic. *Id.* 384. The latter was evidenced by, among other things, Plaintiff's statement that he wanted to go into the military so he could "'kill people,'" but chose not to "because 'they give soldiers a dormant vaccine and if the soldiers don't want to kill people they turn it on with ultrasound and it eats the soldiers up from inside/out.'" *Id.* 382. Dr. Czaban also found that Plaintiff had "thoughts of grandeur" as he "feels he is more important than people, gets angry/impatient when he feels people are wasting his time, when they say stupid things," or "when they are disrespecting him." *Id.* Similarly, in February 2016 Plaintiff was noted to have made "slightly delusional statements" involving

a patent on glass spark plugs he claims to have invented. *Id.* 560; *see also* 448 ("Clt was constantly fidgeting and moving"); 598 (father reported that Plaintiff "had been acting more erratically as of late and has begun more disturbing behaviors").

### 3. Selective Application of the Evidence

The Court also finds that the ALJ erred by selectively applying the medical evidence. An ALJ may not "'pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.'" *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008). While the Court may not reweigh the evidence, it must "assure" itself "that the ALJ gave the relevant material due consideration." *Andersen*, 319 F. App'x at 721.

The ALJ stated that "[w]hile treatment records show the claimant has some problems with irritability and intermittent symptoms of depression and anxiety, there is little evidence that the claimant . . . would be unable to sustain work activity on a continuing and regular basis." Tr. 25. The ALJ noted other similar findings in the record to support his decision to give "lesser weight (*id.*) to the opinions of Dr. Menninger. For example, the ALJ stated that Plaintiff "was observed to have fluid, organized, and concise thoughts and speech patterns[,]" "[m]ental status revealed normal speech, some circumstantial thought processes but no loosening of associations, grossly intact thought and full affect[,]" and that progress notes in early 2017 "reflect the claimant's thoughts remained organized and his mood and affect were appropriate." *Id.* 24. These findings and observations do not, however, represent the full picture of Plaintiff's mental disorders.

By way of background, the record reflects that in Plaintiff's first visit with MHCD in 2012, Dr. Menninger noted that Plaintiff referred to his "advanced brain[,]" his "human aura

being so powerful that it is overtaking technology[,]" that his "'bionic energy' was able to project an image of himself through the television and radio[,]" and people on the radio and TV referred to him as "'by the way,' which was the 'handle' that allowed him to know they were speaking of him." Tr. 465, 467. Plaintiff was under court ordered treatment at that time for stealing his father's car and driving to Los Angeles to see actor Tim Allen who he believed was his true father. When he saw that Mr. Allen's garage door was open and the keys were in Mr. Allen's $250,000 car, Plaintiff saw that as a sign that Mr. Allen wanted him to have the car so Plaintiff drove it back to Denver. *Id.* 469. Plaintiff showed no insight that what he had done was wrong. *Id.*

While the ALJ noted the incident with Mr. Allen in passing (Tr. 21), he selectively applied the evidence on the issue stating that Plaintiff was assessed at that time "to be <u>not</u> gravely disabled." *Id.* That record, in context, showed that Plaintiff was given a GAF score of "40 – Impaired reality testing[,]" and indicated that Plaintiff had not made any substantial progress in treatment and "did not seem to have insight into his symptoms or illness." (*Id.* 347-349). The record also showed that Plaintiff sent a letter to a Denver district attorney advising that he needed to file a "class action lawsuit against QVC" who had "threatened to kill" Plaintiff, and stating that his "person/image is being videotaped and broadcasted on a daily basis." *Id.* 255. The ALJ did not discuss this evidence.

During the time period relevant to the decision, the ALJ also had evidence that exemplified the mental symptoms that Dr. Menninger had identified, including Plaintiff's impaired thought processes and his significant issues in social functioning and difficulty maintaining work. The Court previously referenced the assessment of Dr. Czaban which documented Plaintiff's abnormal/psychotic thought processes, as well as other findings

from MHCD. The evidence also showed that Plaintiff obtained a job painting, but lost the job because his employer was an "idiot." Tr. 469. Plaintiff said that he "feels like everyone but him gets employment, and he doesn't appreciate it and will 'kick their asses.'" *Id.* 550. He was to participate in the 2Succeed program, but didn't want to because of "weirdos" at the locations. *Id.* 538. Dr. Malmstrom noted that Plaintiff "has a history of inability to hold onto jobs and is intolerant of persons he considers to be less able than himself." *Id.* 412. Yet the ALJ found that "[t]here is no evidence of significant communicative deficits in the record or concrete evidence of difficulty interacting with others." *Id.* 16. In light of the above evidence, this finding is not supported by substantial evidence.

The transcript of the hearing further illustrated Plaintiff's difficulties with social functioning in connection with jobs and his lack of insight into how his own behaviors impacted this. Plaintiff testified that he was never able to keep a job more than six months, and that when he worked for his dad for about that amount of time he "couldn't get along with anybody . . . so his dad couldn't have him working there." Tr. 41-42. Plaintiff stated that this was because his father did not have the time "to teach people to get along[,]" and that the other employees thought Plaintiff was being bossy. *Id.* 42, 44. According to Plaintiff, he was not being bossy and the other employees "just wanted to have some kind of edge or advantage . . . so that they don't get in trouble by me, because of me or something." *Id.* 57. This explanation is consistent with the "thoughts of grandeur" noted by Dr. Czaban. *Id.* 382. Plaintiff also testified that he got a job mowing lawns because the employer knew him, that he had "struggles," and he lost the job due to a conflict with a coworker. He lost a job at Home Depot due to the same problem. *Id.* 55. Plaintiff admitted that he gets frustrated and yells a lot at people, *id.* 50, and that he feels like people are

trying to mess with him.  *Id*. 56.  Plaintiff further stated that he had conflicts with his family, noting among other things that his brothers were "disrespectful" to him.  *Id*. 58-63.  Finally, Plaintiff's testimony evidenced further thoughts of grandiosity as he described himself as a "high performance auto mechanic" and "authority and a master at auto mechanics," while admitting that he had no formal training, and that he "picked it up" by attending car shows with his dad when he was three or four years old.  *Id*. 49.

The ALJ's findings did not adequately take into account the above evidence.  The findings demonstrate, at best, a lack of insight into Plaintiff's significant mental health issues and how they impacted his ability to work, or at worst, a determined effort to downplay those issues.  The Tenth Circuit has found legal error when, as here, an ALJ selectively picks out favorable notations from the treatment record, "downplaying the severity of a chronic mental impairment inherently varying with the vicissitudes of the patient's life," finding that "reflects the kind of misleading selective inquiry courts have decried on numerous occasions."  *Hierstein v. Chater*, No. 96-6233, 1997 WL 158177, at *2 (10th Cir. April 2, 1997); *see also Carpenter*, 537 F.3d at 1267-68 (finding error where the ALJ "failed to discuss all of the significantly probative evidence relevant to Carpenter's mental impairment, discuss how he resolved the conflicts in this evidence, or discuss how he resolved the conflicts between his findings and the evidence").

The ALJ's superficial treatment of the evidence and lack of insight into Plaintiff's mental impairments are further illustrated by the ALJ's finding that Plaintiff's "work activity since his alleged onset date capacity, as well as his ongoing search for employment, suggests he retains significant capacity to perform work activities."  Tr. 21.  Not only is this finding inconsistent with the testimony of Plaintiff and Plaintiff's father (*id*. 65-67), and the

findings of Dr. Menninger and Dr. Malmstrom, it is inconsistent with Plaintiff's earning history. *Id.* 179-83. Given the fact that Plaintiff has never held a job for any significant amount of time (*id.*), the ALJ's finding that Plaintiff retains significant capacity to work appears to be unsupported by substantial evidence.

As the SSA has recognized and the ALJ failed to adequately consider:

The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. . . . Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.

SSR 85-15, 1985 WL 56867, at *6 (1985). This means that a mentally impaired person may have difficulty not only in finding a job, but in holding a job, which the ALJ did not consider. *See Washington*, 37 F.3d at 1442 (a finding a claimant is able to engage in SGA "'requires a determination that the claimant can *hold* whatever job he finds for a significant period of time") (citation omitted).

The ALJ also chose to find that Plaintiff was not entirely credible because "there are indications in the record that he is planning to restart college to complete his degree; and might start his own business." Tr. 21. However, none of those things had come to fruition. Rather, as of the time of the hearing, Plaintiff had not completed his college readmission paperwork and was not enrolled in any courses, and did not have a job. *Id.* 47-48. Given the difficulties Plaintiff had with maintaining any kind of consistency in jobs or other efforts, as well as his apparent lack of insight into his condition, this finding of the ALJ is unrealistic and also not supported by substantial evidence.

The ALJ further referred to Plaintiff being "too busy" to follow up with care and to Plaintiff's lack of compliance with medication and treatment. Tr. 20. The ALJ stated, "[s]urely if the claimant's symptoms were severe as alleged he would follow treatment recommendations on a consistent basis." *Id.* 21. This Court has stated, however, that it "'appears unreasonable . . . to permit an ALJ to draw negative inferences from the treatment decisions of a claimant with a confirmed mental illness, at least where those decisions are both self-directed and apparently contrary to medical advice." *Knuutila v. Colvin*, 127 F. Supp. 3d 1146, 1152 (D. Colo. 2015) (citation omitted). This seems particularly apt in this case where Plaintiff denies or has limited insight into his mental illness. *See* Tr. 24, 463, 471, 589. Similarly, the ALJ cited the fact that Plaintiff was "doing well with effectively managed symptoms on medication and while in treatment." *Id.* 24-25. The fact that a claimant is generally doing well on medications does not, however, address whether the claimant has work-related restrictions. *Gasiorowski v. Colvin*, No. 12-cv-3068-WYD, 2014 WL 1292871, at *5 (D. Colo. March 31, 2014); *see also Washington*, 37 F.3d at 1440-41 (an observation of a claimant's relative stability under nonstressful circumstances did not undercut the treating psychiatrist's opinions about the plaintiff's inability to cope with the stress of handling people and demands in the work setting).

### 4.    Errors with the Weighing of the Other Medical Opinions

Turning to the other medical opinions, the Court finds the ALJ also erred by selectively picking and choosing which portions of Dr. Malmstrom's opinion to rely on. Thus, the ALJ accepted only the portion of Dr. Malmstrom's opinion that supported a finding that Plaintiff was not disabled, and rejected the portion that supported Plaintiff's claims. Tr. 23. Specifically, the ALJ rejected Dr. Malmstrom's finding that Plaintiff was only marginally

capable of cooperating with coworkers, stating "this opinion appears to be based primarily on the claimant's subjective reporting." *Id.* Dr. Malmstrom's opinion was, however, consistent with other substantial evidence in the record as discussed above, as well as the GAF score of 55 assessed by Dr. Malmstrom, which the ALJ also appeared to reject.[9] The ALJ thus could not reject the opinion as based merely on subjective reporting, at least without further inquiry. *See McGoffin*, 288 F.3d at 1252.

Finally, the ALJ gave great weight to the opinion of Dr. Suyeishi (Tr. 25), even though an opinion of an agency psychologist who has never seen the claimant is generally entitled to the least weight. *Robinson*, 366 F.3d at 1084. Dr. Suyeishi did not have the benefit of Dr. Menninger's opinions (Tr. 89-91), and stated that Dr. Malmstrom did "not view [claimant] as having any work related abilities that would prevent [claimant] from sustaining SGA." *Id.* 94. Dr. Suyeishi thus stated that he gave "significant weight" to Dr. Malmstrom's opinion "as it is consistent with the clmt's functioning." *Id.* However, Dr. Suyeishi then inconsistently stated that Dr. Malmstrom's opinion "is an overestimate of the severity of the individual's restrictions/limitations and is based only on a snapshot of the individual's functioning." *Id.* 95. Thus, he appeared to reject Dr. Malmstrom's opinion that Plaintiff was "only marginally capable of cooperating with coworkers" (*id.* 413), finding that Plaintiff "can accept supervision and relate to coworkers if contact is not prolonged or frequent." *Id.* 94.

---

[9] A GAF score of 55 is indicative of "'[m]oderate symptoms" OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n. 1 (10h Cir. 2012). Even moderate limitations can impact the ability to work and must be included in the RFC. *Jaramillo v. Colvin*, 576 F. App'x 870, 874, 876 (10th Cir. 2014).

Dr. Suyeishi did not cite any evidence that supported his finding that Dr. Malmstrom's opinion was an overestimate of Plaintiff's limitations, and it is not supported by any of the medical evidence that was provided. Tr. 89-91. It also appears to be improper speculation, particularly as Dr. Suyeishi did not have the opportunity to observe Plaintiff as Dr. Malmstrom did. Accordingly, it appears that Dr. Suyeishi's opinion rejecting Dr. Malmstrom's finding regarding coworkers may not be substantial evidence that the ALJ could rely on. *See Lee v. Barnhart,* 117 F. App'x 674, 678 (10th Cir. 2004) (an ALJ's reliance on a nonexamining agency provider's opinion is reasonable only insofar as that opinion is supported by evidence in the record) (citing SSR 96-6P, 1996 WL 374180, at *2).

**5.      Conclusion**

Based on the foregoing, the case must be remanded for a proper weighing of the medical opinions and the medical evidence. This will necessarily require that the RFC be reassessed, as it is not supported by substantial evidence. The ALJ's errors in evaluating the medical evidence and opinions were particularly significant in this case as the vocational expert testified that all jobs, including simple, routine jobs, would be eliminated for a person who was limited to "only occasional contact with supervisors and no contact with co-workers and the general public." Tr. 80. In addition, the VE testified that being off-task more than 15 percent of the time would eliminate all competitive employment (*id*. 79), and that a failure to accept supervisors' instructions or being told of errors, or refusal to follow instructions as outlined, would eliminate all employment (*id*. 81). Similarly, Dr. Menninger's findings that Plaintiff would miss more than four days of week per month (Tr. 422) would likely eliminate employment.

**B.    Credibility**[10]

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. . . ." Tr. 19.    "'Credibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence.'" *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec. of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)).    "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Id.* (quotations omitted).

The Court finds that the ALJ's credibility analysis is also not supported by substantial evidence.    Many of the errors the Court discussed in Section III.A, *supra*, impacted the credibility finding, including the ALJ's selective application of the medical evidence and the evidence regarding Plaintiff's difficulty interacting with others and his ability to perform work activities; the ALJ's reliance on Plaintiff's testimony about restarting college and starting his own business; and the ALJ's apparent lack of insight into Plaintiff's mental impairments.

---

[10] In 2016, the SSA eliminated the use of the term "credibility" from its sub-regulatory policy. *Kellams v. Berryhill*, 696 F. App'x 909, 917 n. 4 (10th Cir. 2017) (citing SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016)).    However, the analysis remains essentially the same; thus, for ease of reference the Court will refer to this challenge as one speaking to Plaintiff's credibility.    *See Walker v. Comm'r, Soc. Security Admin.*, No. 19-cv-00099-NYW, 2019 WL 6117801, at * (D. Colo. Nov. 15, 2019) (citing *Watts v. Berryhill*, 705 F. App's 759, 763 n.4 (10th Cir. 2017)).

The ALJ also found that Plaintiff's testimony regarding his behaviors around others was not consistent with the medical evidence, stating that "with consistent treatment and compliance with medication, Plaintiff is pleasant with calm, clear, and organized thought processes. . . .". Tr. 20, *see also* 16 (finding only moderate limitations as to interacting with others because "[t]he bulk of mental health visits indicate the claimant presents as pleasant"). The ALJ was not entitled to infer, however, that Plaintiff's ability to interact appropriately with medical sources translates into an ability to interact appropriately with coworkers and supervisors at a full time job. This was improper speculation or a lay judgment on the ALJ's part. *See Winfrey v. Chater*, 92 F.3d 1017, 1021-22 (10th Cir. 1996) (an ALJ may not substitute his own medical judgment for that of mental health professionals).

The ALJ further relied on Plaintiff's activities of daily living that the ALJ found "require significant functional ability and some consistent form of attention and contact with others." Tr. 20. This does not appear to be consistent with Plaintiff's testimony that he spends most of his time applying for jobs, listening to music and watching videos or playing on the computer, and not doing much around the house. *Id.* 61. It is also not consistent with Dr. Malmstrom's finding that while Plaintiff likes people, "he is intolerant of them and refuses to socialize." *Id.* 413. Further, the ALJ did not explain how Plaintiff's ability to prepare simple meals or perform ordinary household tasks established that he was capable of performing work on a regular and continuing basis. *See Frey v. Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987). The record showed that Plaintiff's personal hygiene varied, as well. At times he presented neat and clean, and other times he did not. Dr. Malmstrom observed that Plaintiff "was of minimal hygiene, sweaty, and his nails were in need of care." Tr. 410-

11. Dr. Malmstrom also noted Plaintiff's statement that he had days where depression was a significant issue, resulting in Plaintiff staying in his pajamas and having poor hygiene. *Id.*

The ALJ also stated relevant to credibility that it appeared Plaintiff was not working because he believed it might interfere with his application for disability benefits. Tr. 20, 26. This statement is, however, inconsistent with the ALJ's finding that "Plaintiff's "work activity since his alleged onset date capacity, as well as his ongoing search for employment, suggests he retains significant capacity to perform work activities." *Id.* 21. In fact, Plaintiff testified at the hearing that he spends most of his time applying for jobs. *Id.* 46, 50.

Finally, the Court finds that the ALJ's credibility evaluation ultimately appeared to reflect the ALJ's disbelief of Plaintiff's subjectively reported symptoms and the symptoms found by both Drs. Menninger and Malmstrom. Given the AlJ's selective application of the evidence and improper weighing of the medical opinions and evidence, as discussed in Section III.A, *supra*, Plaintiff's credibility must be reassessed on remand.

## C. Steps Four and Five Findings

As the Court found that the ALJ improperly weighed the medical opinions and that the ALJ's credibility finding is not supported by substantial evidence, this requires that the findings at step four and step five be reassessed on remand. The Court also notes at step four that Plaintiff asserts, and the evidence suggests (Tr. 181-83), that his past work activities did not amount to SGA. This must be reassessed on remand. The ALJ must also consider all impairments in the RFC at both steps four and step five. *See id.* 27 (adding at step five a limitation to simple and routine tasks). At the hearing, the ALJ recognized that the limitation to "simple and routine tasks" would eliminate the SVP 5 job at step four. *Id.* 80.

Finally, at step five, the ALJ must adequately weigh the findings of Drs. Menninger and Dr. Malmstrom regarding Plaintiff's social functioning limitations with regard to supervisors and coworkers. When the vocational expert was asked about "only occasional contact with supervisors and no contact with co-workers and the general public," along with the additional limitation that the jobs must be at a "simple, routine level," consistent with Dr. Menninger's findings, the vocational expert eliminated all jobs. Tr. 80.

## VI. Conclusion

For the reasons set forth above, it is

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for further proceedings consistent with this Order pursuant to sentence four in 42 U.S.C. § 405(g).

Dated: March 9, 2020

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge